UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

CHRISTOPHER D'ARPA, JOSUE JOEL
PUJOLS-VASQUEZ, DESMOND
MITCHELL, EDGAR PADILLA, individually
and on behalf of all other persons similarly
situated,[1]

                              Plaintiffs,

                - versus -

RUNWAY TOWING CORP.; RUNWAY
TOWING & RECOVERY CORP.; CYNTHIA
PRITSINEVELOS; CHRIS
PRITSINEVELOS; JOHN DOES # 1-10; XYZ
CORPORATIONS # 1-10, jointly and
severally,

                              Defendants.

MEMORANDUM
AND ORDER
12-CV-1120

APPEARANCES:

    GARY ROSEN LAW FIRM, P.C.
        1010 Northern Boulevard, Suite 322
        Great Neck, New York  11021
    By:   Gary Rosen
          *Attorneys for Plaintiffs*

    MARGOLIN & PIERCE, LLP
        111 West 57th Street
        New York, New York  10019
    By:   Philip Pierce
          *Attorneys for Defendants*

---

[1]      The original complaint named only Christopher D'Arpa and Josue Joel Pujols-Vasquez as plaintiffs.  The first and second amended complaints added Desmond Mitchell and Edgar Padilla as named plaintiffs, but it appears that counsel for plaintiffs did not add Mitchell and Padilla as parties to the action via ECF when he filed these complaints.  Accordingly, the Clerk is directed to add Mitchell and Padilla as plaintiffs in this action.

JOHN GLEESON, United States District Judge:

Christopher D'Arpa, Josue Joel Pujols-Vasquez, Desmond Mitchell, Edgar Padilla, and fifteen opt-in plaintiffs[2] (collectively, "Plaintiffs") bring this putative class and collective action pursuant to the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") against Runway Towing Corp., Cynthia Pritsinevelos, Chris Pritsinevelos, and various unnamed individuals and corporations (collectively, "Defendants") to, *inter alia*, recover hourly, overtime, and spread of hours wages allegedly due to them.[3] Plaintiffs move for partial summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56,[4] collective certification pursuant to the FLSA, and class certification pursuant to Fed. R. Civ. P. 23(a) and b(3). Defendants cross-move for partial summary judgment.[5] For the reasons stated below, both motions are granted in part and denied in part.

---

[2] The names of these opt-in plaintiffs are Anthony Alicia, Jeremy Bennett, Manuel Carpintero, Vernon Dann, Victor Fallas, Bryan Gonzales, Jeffrey Kimbrough, Donnie Mack, Nedim Adam Mergen, Mariano Perez, Jr., Pastor Rivera, Jose Rodriguez, Ricardo Sanabria, Jacqueline Shao, and Anatole Williams.

[3] In their papers, Plaintiffs concede that none of the Plaintiffs ever worked for Runway Towing & Recover Corp. Pls.' Rule 56.1 ¶ 191. Accordingly, I hereby dismiss this named defendant from the action.

[4] Plaintiffs style their motion as one for summary judgment on all claims, but I construe it as a motion for partial summary judgment as it does not address the breach of contract claim pled in their second amended complaint and it does not purport to address certain damages issues.

[5] Like Plaintiffs, Defendants style their motion as one for summary judgment on all claims, but the motion fails to address all of Plaintiffs' claims. Thus, I also construe their motion as one for partial summary judgment. Defendants have submitted their cross-motion for partial summary judgment without requesting a pre-motion conference for permission to file such motion in contravention of my Individual Motion Practices and Rules. Despite this procedural aberration, I will consider both motions for summary judgment.

BACKGROUND

A.      *Factual Background*[6]

       1.      *The Parties*

              a.      *Runway Towing Corp. ("Runway")*

Runway Towing Corp. ("Runway") is a New York corporation formed on May 6, 2004.  Pls.' Rule 56.1 ¶ 204; Rosen Decl. Ex. 30 (NYS Dep't of State Entity Information).  Runway operates a fleet of eighteen tow trucks.[7]  Defs.' Rule 56.1 ¶ 3.  Runway has a permit, issued by the New York City Police Department, to provide road service on the Belt Parkway

---

[6]      Both parties have submitted Rule 56.1 statements and responses to each other's statements that fail to meet the requirements of Local Rule 56.1.  Both Rule 56.1 statements mix factual assertions with legal argument.  Plaintiffs' Rule 56.1 statement is highly disorganized, bordering on chaotic.  It also repeats the same factual assertions again and again (with the same citations to the record).  Defendants' Response to Plaintiffs' Rule 56.1 statement does not include correspondingly numbered paragraphs responding to each numbered paragraph in Plaintiffs' Rule 56.1 statement.  It also consistently fails to cite to admissible evidence in controverting a factual assertion contained in Plaintiffs' Rule 56.1 statement.  The facts, as set forth in this memorandum and order, are taken from those assertions contained in the Rule 56.1 statements that comply with Local Rule 56.1, as well as other documentary evidence submitted by the parties.  Unless otherwise noted, the facts set forth below are uncontroverted.

[7]      Plaintiffs dispute this fact (as well as others in Defendants' Rule 56.1 Statement) on the ground that the cited evidence – a declaration by Chris Pritsinevelos – is invalid because it fails to comply with 28 U.S.C. § 1746.  Pls.' Resp. Rule 56.1 ¶ 3.  28 U.S.C. § 1746 provides:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, . . . in writing of the person making the same . . . , such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
>
> . . .
>
> (2) If executed within the United States . . . : "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

Plaintiffs take issue with Chris Pritsinevelos's Declaration because it fails to include the exact language "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)."  Plaintiffs' argument is petty and without merit.  The first line of the Declaration reads "Chris Pritsinevelos hereby declares under penalty of perjury as follows."  Furthermore, the declaration is signed and dated.  Accordingly, the Declaration complies with 28 U.S.C. § 1746, which requires only that sworn declarations provide "in substantially the following form" the language provided in the statute.

3

(Gowanus Expressway to Rockaway Parkway).  Pls.' Rule 56.1 ¶ 198; Rosen Decl. Ex. 27

(Permit).  This permit authorizes Runway to patrol the Belt Parkway for disabled vehicles.  Pls.'

Rule 56.1 ¶ 199; Rosen Decl. Ex. 28 (Arterial Towing Proposal).  Runway is registered with the

United States Department of Transportation ("DOT") and has been issued DOT Identification

Number 14723479.  Pls.' Rule 56.1 ¶ 218; Defs.' Resp. Rule 56.1 ¶ 12.  Runway generates over

$500,000 a year in revenue.  Pls.' Rule 56.1 ¶ 215.

### b. *Cynthia and Chris Pritsinevelos*

Cynthia Pritsinevelos is the President and a shareholder of Runway.  Pls.' Rule

56.1 ¶¶ 86, 190.  She holds a Bachelor's Degree from Hofstra University in Banking and Finance

and  a Master's Degree from Drexel University in Banking and Finance.[8]  *Id*. ¶¶ 89-90.  As

President of Runway, she is responsible for office management and payroll for the company.  *Id*.

¶¶ 88, 186.  Chris Pritsinevelos is Cynthia Pritsinevelos's husband and is the Operations

Manager for Runway.  *Id*. ¶¶ 87, 188.  He was also a shareholder of Runway from May 6, 2004

to January 1, 2008, at which point he transferred his shares to his wife.  *Id*. ¶ 189.  Both Cynthia

and Chris Pritsinevelos hold the power to hire and fire employees.  *Id*. ¶¶ 226-228; Rosen Decl.

Ex. 4, at 10:18-19 (Chris Pritsinevelos Dep.).

### c. *Plaintiffs*

Defendants employed D'Arpa as a tow truck driver and to patrol the Belt Parkway

for disabled vehicles from approximately April 10, 2010 and January 30, 2012.  Pls.' Rule 56.1 ¶

9; Rosen Decl. Ex. 5 ¶¶ 5-7 (D'Arpa Decl.).  Defendants dispute that Runway employed D'Arpa,

---

[8]     Defendants purport to dispute this fact on the novel ground "that the deposition from which these extracts were taken speaks for itself."  Defs.' Resp. Rule 56.1 ¶ 6.  Such a statement fails to establish any dispute.  In the cited portions of the deposition, Pritsinevelos clearly testifies to obtaining these two degrees.  Rosen Decl. Ex. 3, at 5:22-25, 100:12-101:8  (Cynthia Pritsinevelos Dep.).  To the extent that Defendants dispute Plaintiffs' citation to deposition testimony, such testimony is the type of "familiar record material[] commonly relied upon" by parties as support for their factual assertions.  Fed. R. Civ. P. 56 Advisory Committee Notes, 2010 Amendments, Subdivision (c).

describing him instead as "a commissioned salesman." Defs.' Resp. Rule 56.1 ¶ 2. They do not, however, appear to dispute that D'Arpa performed towing and patrolling services for Runway, whether as an employee or independent contractor.

Defendants employed Pujols-Vasquez as a tow truck driver from approximately May 11, 2010 to September 5, 2011. Pls.' Rule 56.1 ¶ 11; Rosen Decl. Ex. 11 ¶¶ 5-6 (Pujols-Vasquez Decl.). They employed Mitchell as a tow truck driver from approximately April 20, 2010 to December 30, 2011. Pls.' Rule 56.1 ¶ 12; Rosen Decl. Ex. 8 ¶¶ 5-6 (Mitchell Decl.). They employed Padilla as a tow truck driver from approximately June 2, 2011 to December 12, 2011. Pls.' Rule 56.1 ¶ 13; Rosen Decl. Ex. 13 ¶¶ 5-6 (Padilla Decl.). Thirteen of the fifteen opt-in plaintiffs – Alicia, Bennett, Carpintero, Dann, Gonzales, Kimbrough, Mack, Mergen, Perez, Rivera, Rodriguez, Sanabria, Williams – also worked as tow truck drivers for Runway at various points between 2006 and 2011. Pls.' Rule 56.1 ¶¶ 14-26. Defendants employed Fallas as a dispatcher from approximately October 3, 2010 to September 21, 2012. *Id.* ¶ 17; Rosen Decl. Ex. 7 ¶¶ 5-6 (Fallas Decl.). They employed Shao as a secretary and office assistant from approximately August 27, 2007 to September 13, 2012. Pls.' Rule 56.1 ¶ 28; Rosen Decl. Ex. 17 ¶¶ 5-6 (Shao Decl.).

### 2. *Runway's Overtime Compensation of Employees*

Runway did not pay overtime based on a forty-hour week. Pls.' Rule 56.1 ¶ 97. Rather, it paid overtime only if an individual worked more than twelve hours in one day. *Id.* ¶ 98. Cynthia Pritsinevelos believed the towing industry was required to pay overtime to employees only if they worked over twelve hours per day. *Id.* ¶ 94. Runway's rate of pay for

overtime was not one and one-half times the regular rate, but rather was $10 per hour. *Id.* ¶¶ 100, 105. Runway did not pay spread-of-hours wages.[9] *Id.* ¶ 120.

Each of the Plaintiffs worked over forty hours in a week for Defendants and was not paid one and one-half of his or her hourly rate for each hour worked over forty hours.[10] *Id.* ¶¶ 52-66. Each of the Plaintiffs also worked more than ten hours in one day for Defendants on more than one occasion. Pls.' Rule 56.1 ¶¶ 33-50; Rosen Decl. Ex. 17 ¶ 25 (Shao Decl.). Defendants paid D'Arpa, Pujols-Vasquez, Mitchell, and Padilla between $100 and $120 per day for a twelve-hour day, *id.* ¶¶ 71-72, 74, 78, and paid Alicia, Bennett, Carpintero, Dann, Gonzales, Kimbrough, Mack, Mergen, Rivera, Rodriguez, Sanabria, and Williams between $90 and $120 per day for a twelve-hour day, *id.* ¶¶ 67-70, 73, 75-77, 79-82. Defendants variously paid Fallas $40, $90, $100, and $120 per day for a twelve-hour day. *Id.* ¶ 83. They paid Perez between $10 and $12 per hour, *id.* ¶ 84, and Shao between $9 and $15 per hour, *id.* ¶¶ 84-85.

Defendants did not provide wage statements to their employees. *Id.* ¶ 211. They issued W-2s to the employees they compensated by check, but not to those compensated in cash. *Id.* ¶ 122. Defendants issued W-2s to some employees and 1099s to others. Rosen Decl. Ex. 3, at 172: 4-22 (Cynthia Pritsinevelos Dep.).[11]

---

[9] Defendants dispute these facts on the ground "that the deposition from which these extracts were taken speaks for itself" and that defendants are exempt from FLSA overtime requirements pursuant to 29 U.S.C. § 213(b)(1). Defs.' Resp. Rule 56.1 ¶ 6. The latter statement is a legal argument that fails to controvert a factual assertion. With respect to the former argument, the cited portions of the deposition support these factual assertions. Rosen Decl. Ex. 3, at 13:15-14:19, 15:25-16:3, 52:24-53:4 (Cynthia Pritsinevelos Dep.). Accordingly, I deem these facts admitted for purposes of this motion.

[10] Defendants dispute these facts "upon the ground that the individuals . . . fall under the exemption from FLSA overtime requirements provided by 29 U.S.C. § 213(b)(1)," citing to their cross-motion for partial summary judgment. Defs.' Resp. Rule 56.1 ¶ 5. As noted above, this statement is a legal argument that fails to controvert a factual assertion. Accordingly, I deem these facts admitted for purposes of this motion.

[11] Defendants dispute these facts on the ground that they are irrelevant to the case. Defs.' Resp. Rule 56.1 ¶¶ 6, 11. The facts related to the issuance of wage statements and W-2s are relevant to the documentation of compensation paid to Plaintiffs and are therefore relevant to the issues of this case. Defendants cite to no admissible evidence to controvert these facts and they are accordingly deemed admitted for purposes of this motion.

B.    *Procedural History*

Plaintiffs filed their complaint on March 7, 2012.  *See* Compl., ECF No. 1.

Defendants filed their answer on April 4, 2012.  *See* Answer, ECF No. 7.  Plaintiffs filed an

amended complaint on April 8, 2012.  *See* 1st Am. Compl., ECF No. 9.  Defendants filed their

answer to the amended complaint on April 19, 2012.  *See* Am. Answer, ECF No. 11.  Plaintiffs

filed a second amended complaint on March 7, 2013.[12]  *See* 2d Am. Compl., ECF No. 92.

On June 26, 2012 the Court approved a stipulation agreeing to the conditional

certification of a collective action.  Order, June 26, 2012.  On July 13, 2012 the Court approved

the proposed notice of collective action.  Order, ECF No. 16.  Fifteen individuals subsequently

consented to opt-in to this action.[13]  *See* Consents to Joinder, ECF Nos. 24, 35, 36, 39, 40, 41,

42, 43, 47, 48, 49, 52, 53, 61, 63.

The parties completed discovery on March 22, 2013.  Minute Entry, Mar. 7, 2013.

Plaintiffs filed their motion for partial summary judgment, collective certification, and class

certification on April 14, 2013.  *See* Mot. Summ. J., ECF No. 118.  The motion seeks summary

judgment on the following claims: (1) FLSA claims for overtime, minimum wage, and

retaliation, and (2) NYLL claims for overtime, minimum wage, spread-of-hours, unlawful

deductions, and failure to provide notice.  Defendants filed a cross-motion for partial summary

judgment on May 17, 2013.  *See* Cross-Mot. Summ. J., ECF No. 121.  The motion seeks

summary judgment on Plaintiffs' overtime and minimum wage claims pursuant to the FLSA.  I

heard oral argument on June 12, 2013.

---

[12]    The Court deemed the answer to the first amended complaint sufficient to serve as the answer to the second amended complaint.  Minute Entry, Mar. 7, 2013.

[13]    Defendants claim that one of the named plaintiffs (Josue Joel Pujols-Vasquez) and two of the opt-in plaintiffs (Jose Rodriguez and Victor Fallas) have opted out of this action.  In a Memorandum and Order dated December 5, 2012, Magistrate Judge Reyes granted Plaintiffs' motion for an order prohibiting any plaintiff from withdrawing from this action without court approval following a fairness hearing.  Mem. & Order, Dec. 5, 2012, ECF No. 74.  Neither party has moved for a fairness hearing.  Accordingly, Pujols-Vasquez, Rodriguez, and Fallas remain plaintiffs in this action.

DISCUSSION

A.      *Summary Judgment Standard*

A court may grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

B.      *The Fair Labor Standards Act ("FLSA")*

Congress enacted the FLSA in 1938 to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers," 29 U.S.C. § 202(a), and to "guarantee [ ] compensation for all work or employment engaged in by employees covered by the Act." *Tennessee Coal, Iron & Railroad Company v. Muscoda Local No. 123*, 321 U.S. 590, 602 (1944). As part of that effort, the Act imposes numerous "wage and hour" requirements, including establishing a minimum wage and requiring overtime pay, both of which are at issue in this case. 29 U.S.C. §§ 206, 207.

1.      *Statute of Limitations*

As a threshold matter, the parties cross-move for summary judgment on the appropriate statute of limitations under the FLSA. Defendants argue that the two-year statute of

limitations should apply to Plaintiffs' FLSA claims.  Plaintiffs assert that Defendants acted with willfulness justifying the application of a three-year statute of limitations under the FLSA.

A plaintiff must commence a suit under the FLSA within two years after the cause of action has accrued, unless a plaintiff can demonstrate that a defendant's violation of the Act was willful, in which case a three-year statute of limitations applies.  29 U.S.C. § 255.  For an employer's actions to be willful, the employer must have "either [known] or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  "Courts in this Circuit have generally left the question of willfulness to the trier of fact."  *Ramirez v. Rifkin*, 568 F. Supp. 2d 262, 268 (E.D.N.Y. 2008) (collecting cases).

The record is rife with evidence indicating knowledge or at least reckless disregard on the part of Defendants of their own FLSA violations.  Nearly all of the Plaintiffs testified that Defendants paid them in cash in a sealed envelope, which did not include a paystub or statement of wages.  *See* Rosen Decl. Ex. 5 ¶ 11 (D'Arpa Decl.); Rosen Decl. Ex. 6 ¶ 10 (Dann Decl.); Rosen Decl. Ex. 7 ¶¶ 9-10 (Fallas Decl.); Rosen Decl. Ex. 8 ¶ 10 (Mitchell Decl.); Rosen Decl. Ex. 9 ¶ 10 (Gonzales Decl.); Rosen Decl. Ex. 10 ¶ 10 (Kimbrough Decl.); Rosen Decl. Ex. 12 ¶ 10 (Rodriguez Decl.); Rosen Decl. Ex. 13 ¶ 10 (Padilla Decl.); Rosen Decl. Ex. 14 ¶ 10 (Mack Decl.); Rosen Decl. Ex. 15 ¶ 10 (Carpintero Decl.); Rosen Decl. Ex. 16 ¶¶ 9-10 (Sanabria Decl.); Rosen Decl. Ex. 17 ¶ 17 (Shao Decl.); Rosen Decl. Ex. 18 ¶¶ 9-10 (Williams Decl.); Rosen Decl. Ex. 20 ¶¶ 9-10 (Alicia Decl.); Rosen Decl. Ex. 22 ¶¶ 9-10 (Perez Decl.). The record further indicates that Defendants kept no signed receipts of these cash payments. *See, e.g.*, Rosen Decl. Ex. 3, at 78:3-24 (Cynthia Pritsinevelos Dep.).  Moreover, Cynthia Pritsinevelos's own testimony indicates that this practice of cash payment without signed

receipts was a fairly regular occurrence.  *Id*. at 78:24-79:10 ("Q: Were you ever concerned or did you ever think that an employee may say that they did not get paid any money for a week that they worked because you did not have a signed receipt from them?  A: No.  Q: Why not?  A: Because you wouldn't continue working for me if I didn't pay you.").

Defendants also admitted that they did not issue W-2s to all employees.  Rather, they issued W-2s only to those employees they compensated by check.  Rosen Decl. Ex. 3, at 48:3-14 (Cynthia Pritsinevelos Dep.).  And as discussed above, Defendants paid nearly all of the Plaintiffs in cash.  Defendants further admitted to issuing W-2s to some individuals on their payroll and 1099s to others, but failed to explain what differentiated these individuals (*i.e.*, why some were classified as employees and others as independent contractors).  *Id*. at 171:20-172:22.

This evidence supports the inference that Defendants were either aware that they were not paying the proper wages under the FLSA or acted in reckless disregard for whether their conduct was subject to the Act.  Defendants, for their part, cite to no admissible evidence controverting these facts.  Rather, they assert in conclusory fashion that "the Court should apply the two year limitations period . . . because the defendants had a reasonable belief that they were exempt from the FLSA because they were engaged in both interstate [and] intrastate commerce and their actions were not willful."  Defs.' Mem. in Opp. Mot. Summ. J. 11.  As discussed below, Defendants are not exempt from the FLSA, nor does the record contain any evidence that would permit them to reasonably believe they were exempt.  This argument notwithstanding, Defendants' method of compensating nearly all of the Plaintiffs in cash and their arbitrary issuance of W-2s leads me to conclude, as a matter of law, that Defendants acted willfully.[14]

---

[14]     Defense counsel contended at oral argument that Cynthia Pritsinevelos was unaware of the impropriety of paying employees off the books and not paying payroll taxes, among other things.  But any small business owner, much less one with a Master's Degree in Banking and Finance, would know better.

Accordingly, I grant Plaintiffs' motion for summary judgment on the statute of limitations and find that the three-year statute of limitations is applicable to their FLSA claims.

Several of the opt-in plaintiffs' FLSA claims are barred even under the more generous three-year statute of limitations. 29 U.S.C. § 256 provides that for purposes of a collective action, a claim is deemed commenced by an individual claimant:

> (a) On the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the Court in which the action is brought; or
>
> (b) *if such written consent was not so filed or if his name did not so appear – on the subsequent date on which such written consent is filed in the court in which the action was commenced.*

(emphasis added). "Therefore, the statute of limitations period continues to run with respect to each potential plaintiff's collective action claim until that plaintiff files the written consent form." *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 199 (S.D.N.Y. 2006) (citing *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 260 (S.D.N.Y. 1997) ("only by 'opting in' will the statute of limitations on potential plaintiffs' claims be tolled")). In other words, "[s]igned consent forms do not relate back to the original filing date of the complaint." *Id.*

The record indicates that several of the opt-in plaintiffs' claims cannot have accrued during the three years that preceded the filing of their written consent forms. "A cause of action under the FLSA accrues on the regular payday immediately following the work period for which services were rendered and not properly compensated." *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 337 (S.D.N.Y. 2005). The following chart summarizes the dates that these Plaintiffs filed their written consent forms and the dates of their employment with Defendants.

| Name | Consent Form Filing Date | Employment with Runway |
|------|--------------------------|------------------------|
| Sanabria | 9/10/12, ECF No. 47 | 12/1/06 – 1/31/08, Rosen Decl. Ex. 16 ¶ 5 (Sanabria Decl.) |
| Kimbrough | 10/1/12, ECF No. 40 | 3/3/06 – 3/21/08, Rosen Decl. Ex. 10 ¶ 5 (Kimbrough Decl.) |
| Bennett | 10/9/12, ECF No. 49 | 9/6/07 – 10/20/07, Rosen Decl. Ex. 21 ¶ 5 (Bennett Decl.) |
| Carpintero | 10/10/12, ECF No. 48 | 1/6/06 – 12/28/06, Rosen Decl. Ex. 15 ¶ 5 (Carpintero Decl.) |
| Williams | 11/13/12, ECF No. 63 | 4/10/09 – 9/25/09, Rosen Decl. Ex. 18 ¶ 5 (Williams Decl.) |
| Dann | 11/14/12, ECF No. 61 | 2/24/06 – 4/2/09, Rosen Decl. Ex. 6 ¶ 5 (Dann Decl.) |

Since the period during which Defendants employed these opt-in plaintiffs expired more than three years prior to their respective filing of the written consent forms, these plaintiffs' FLSA claims cannot have accrued during the three years that preceded the filing of the consent forms. Accordingly, I find the FLSA claims of Sanabria, Kimbrough, Bennett, Carpintero, Williams, and Dann to be time-barred.

2.      *Motor Carrier Exemption*

Defendants move for summary judgment on Plaintiffs' FLSA overtime claims on the ground that they are exempt under the motor carrier exemption.[15]  Exemptions to the FLSA are "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirits." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  Defendants bear the burden of proving that

_____

[15]      Defendants argue that the motor carrier exemption applies to Plaintiffs' FLSA overtime *and* minimum wage claims.  Defs.' Mem. in Supp. Cross-Mot. Summ. J. 5-9.  However, the motor carrier exemption applies only to the FLSA's overtime requirements and not to the minimum wage requirements.  29 U.S.C. § 213(b).

the exemption applies. *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 229 (2d Cir. 2002).

The motor carrier exemption provides that the FLSA's overtime provision "shall not apply . . . to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to [49 U.S.C. §] 31502." 29 U.S.C. § 213(b)(1). The exemption serves to prevent conflict between the FLSA and the Motor Carrier Act of 1935 ("MCA"). *Dauphin v. Chestnut Ridge Transportation, Inc.*, 544 F. Supp. 2d 266, 271 (S.D.N.Y. 2008). Congress enacted the MCA "to promote efficiency, economy, and safety in interstate motor transport." *Khan v. IBI Armored Services, Inc.*, 474 F. Supp. 2d 448, 450-51 (E.D.N.Y. 2007). To help achieve that purpose, it gave the Interstate Commerce Commission ("ICC") – and later, the DOT – the authority to regulate the maximum hours of work for employees of "common carriers" and "contract carriers" by motor vehicle. *Masson v. Ecolab, Inc.*, No. 04-cv-4488, 2005 WL 2000133, at *5 (S.D.N.Y. Aug. 17, 2005). Thus, "[s]o that the overtime provisions of the FLSA and the MCA do not overlap or interfere with each other, those employees whose working hours are regulated by the DOT are exempt from the FLSA's requirements." *Id.*

The motor carrier exemption applies to employees over whom the Secretary of Transportation has jurisdiction regardless of whether the Secretary has actually exercised that authority. *Bilyou*, 300 F.3d 217 at 229. Pursuant to the MCA, "[t]he Secretary of Transportation may prescribe requirements for . . . qualifications and maximum hours of service of employees of, and safety and operation of equipment of, a motor carrier." 49 U.S.C. § 31502(b)(1). The scope of that authority is defined by 49 U.S.C. § 13501, *id.* § 31592(a)(1) ("This section applies to transportation . . . described in sections 13501 and 13502 of this title . . . ."), which grants the

Secretary jurisdiction over, *inter alia*, transportation "by motor carrier . . . to the extent that passengers, property, or both, are transported by motor carrier . . . between a place in (A) a State and a place in another State; [or] (B) a State and another place in the same State through another State." *Id*. § 13501.

The applicability of the motor carrier exemption "depends on the nature of both the employer's and employees' activities." *Dauphin*, 544 F. Supp. 2d at 273 (citing 29 C.F.R. § 782.2(a)).[16] "The employer must be within the jurisdiction of the Secretary of Transportation by virtue of operating as a 'motor carrier' . . . as defined by the statute." *Id*. (citing *Boutell v. Walling*, 327 U.S. 463, 467 (1946) (finding the exemption inapplicable because the defendant employer was not a "carrier" within the meaning of the MCA)). The employee must be engaged in "activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2.

Plaintiffs challenge the applicability of the exemption with respect to the activities of both Runway and its employees.[17] Runway, Plaintiffs allege, is not a "motor carrier" within

---

[16] As the court observed in *Dauphin*, "[t]he Department of Labor's interpretive guidance regarding the motor carrier exemption, although not binding on this Court, *see Levinson v. Specter Motor Service*, 330 U.S. 649, 676-77 (1947); *Troutt v. Stavola Brothers*, 107 F.3d 1104, 1108 n. 1 (4th Cir. 1997), is entitled to respect to the extent that it has the 'power to persuade,' *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))." 544 F. Supp. 2d at 273 n.2.

[17] Plaintiffs also argue that the exemption is an affirmative defense that Defendants pled only with respect to one of the Plaintiffs. This argument is without merit. It is true that the Sixth Affirmative Defense of Defendants' answer to the first amended complaint specifically reads "Defendant Runway Towing Corp. is a motor carrier which transports in interstate commerce and is thus exempt from the FLSA as to the claims of *plaintiff Pujols-Velasquez* pursuant to § 213(b)(1)." Am. Answer ¶ 175 (emphasis added). But as a matter of common sense, if the motor carrier exemption were to apply, then it would exempt Defendants from each Plaintiff's FLSA claims, rather than just those of a single individual. Defendants' answer suffers from sloppy drafting, but I cannot conclude that their articulation of the Sixth Affirmative Defense waives the Motor Carrier Exemption as a defense for all Plaintiffs except Pujols-Velasquez. Furthermore, even if Defendants had failed to raise this defense (in its entirety) in their Answer, "the law is clear that, in the absence of prejudice, 'a defendant may raise an affirmative defense in a motion for summary judgment for the first time.'" *McGuiggan v. CPC International, Inc.*, 84 F. Supp. 2d 470, 480 (S.D.N.Y. 2000). Plaintiffs erroneously assume that the failure to raise an affirmative defense in an Answer automatically waives that defense if later raised at summary judgment.

the meaning of the MCA because a "motor carrier" refers to "a person providing commercial motor vehicle transportation for compensation." Pls.' Reply Mem. in Supp. Mot. Summ. J. 16-17 (citing 49 U.S.C. § 13102(14) (West 2007)). A "commercial motor vehicle," in turn, refers to:

> a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle –
>
> A. has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater,
> B. is designed or used to transport more than 8 passengers (including the driver) for compensation
> C. is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or
> D. is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103

49 U.S.C. § 31132. Plaintiffs assert that Defendants have failed to demonstrate that Runway operates "commercial motor vehicles" because they have submitted no evidence that "the vehicles [Runway] used . . . weighed over 10,001 pounds." Pls.' Reply Mem. in Support Mot. Summ. J. 17.

Plaintiffs fail to recognize recent amendments to the MCA affecting the definition of "motor carrier" that render their argument moot. In 2005, Congress enacted the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), which, *inter alia*, amended the term "motor carrier" to include only "commercial vehicles." P.L. No. 109-59 § 4142, 119 Stat. 1144 (2005). This definitional restriction, to which Plaintiffs refer (and which is reproduced above), limited the Secretary of Transportation's authority to regulate the qualifications and hours of employees of motor carriers to those carriers

operating, *inter alia*, vehicles weighing more than 10,001 pounds. But in June 2008, Congress restored the definition of "motor carrier" to its pre-2005 meaning, *see* SAFETEA-LU Technical Corrections Act of 2008, P.L. No. 11-244 § 305(c), 122 Stat. 1572 (2008), thereby reinstating the jurisdiction of the Secretary of Transportation over *all* vehicles "providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

The SAFETEA-LU Technical Corrections Act has not been given retroactive effect, requiring courts to apply the motor carrier exception as it existed during the time of a plaintiff's employment. *See Fox v. Commonwealth Worldwide Chauffeured Transportation of New York, LLC*, 865 F. Supp. 2d 257, 264 n.9 (E.D.N.Y. 2012) (citing *Benoit v. Tri-Wire Engineering Solutions, Inc.*, 612 F. Supp. 2d 84, 89-90 (D. Mass. 2009); *Vidinliev v. Carey International, Inc.*, 581 F. Supp. 2d 1281, 1891 (N.D. Ga. 2008)). All remaining Plaintiffs, with the exception of Rodriguez and Shao[18] – began their employment with Runway after June 2008. It is undisputed that Runway tows disabled vehicles – *i.e.* provides transportation services – for compensation. Accordingly, Plaintiffs' argument that Runway is not a "motor carrier" as defined by the statute because it does not operate "commercial motor vehicles" is unavailing.[19]

---

[18]     Rodriguez and Shao began their employment with Runway before June 2008. However, their period of employment continued post-June 2008, so at least part of their FLSA overtime claims relies on the same definition of "motor carrier" as the other remaining Plaintiffs.

[19]     The weight of the vehicles operated by Runway remains relevant, however, to analyzing the applicability of the motor carrier exemption. While the SAFETEA-LU Technical Corrections Act restored the Secretary of Transportation's jurisdiction over employees of motor carriers operating vehicles of all sizes, it also amended the FLSA to provide that overtime compensation would be available to "covered employee[s]" notwithstanding the motor carrier exemption. *See* SAFETEA-LU Technical Corrections Act of 2008, P.L. 110-244 § 306(a) ("Beginning on the date of enactment of this Act, section 7 of the Fair Labor Standards Act of 1938 (29 U.S.C. 207) shall apply to a covered employee notwithstanding section 13(b)(1) of that Act (29 U.S.C. 213(b)(1))."). The SAFETEA-LU Technical Correction Act further defined a "covered employee" as an individual:

> (1) who is employed by a motor carrier or private motor carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305)
>
> (2) whose work, in whole or in part, is defined –
>
> (A) as that of a driver, driver's helper, loader, or mechanic; and

Plaintiffs also challenge the applicability of the motor carrier exemption on the ground that their activities did not involve interstate transportation. Pls.' Reply Mem. in Supp. Mot. Summ. J. 13-18. The interstate transportation requirement is met where interstate travel constitutes a "natural, integral, and inseparable" part of an employee's activities. *Dauphin*, 544 F. Supp. 2d at 274 (quoting *Morris v. McComb*, 332 U.S. 422, 431 (1947)). In the case of a driver, which is the position the majority of Plaintiffs held at Runway, interstate transportation is a "natural, integral, and inseparable" part of an employee's activities if that employee "'is likely to be called on to perform interstate travel,' irrespective of how many hours the worker actually devotes to . . . interstate transportation." *Fox*, 865 F. Supp. 2d at 266 (quoting *Dauphin*, 544 F. Supp. 2d at 274 (citing *Morris*, 332 U.S. at 433))).

Defendants cite to two pieces of evidence to demonstrate that Plaintiffs' activities involved interstate transportation. First, they present Runway towing logs, attached to Chris Pritsinevelos's declaration, spanning from July 1, 2010 to April 17, 2013. Chris Pritsenvelos

---

(B) as affecting the safety of operations of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles –

(i) designed or used to transport more than 8 passengers (including the driver) for compensation

(ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or

(iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code; and

(3) *who performs duties on motor vehicles weighing 10,000 pounds or less.*

P.L. 110-244 § 306(c) (emphasis added). In other words, "although the Technical Corrections Act explicitly reinstated the jurisdiction of the Transportation Secretary over drivers of both smaller and larger trucks, the Act also amended the FLSA to provide that drivers who met the definition of a covered employee would be entitled to overtime compensation regardless of whether or not the Transportation [Secretary] had jurisdiction to regulate the hours and conditions of those drivers." *Hernandez v. Alpine Logistics, LLC*, No. 08-cv-6254, 2011 WL 3800031, at *4 (W.D.N.Y. Aug. 29, 2011). Neither party briefed the issue of whether Plaintiffs are "covered employees," but I need not address it as I find that the motor carrier exemption does not apply for other reasons explained below.

Decl. Ex. C.  Second, they highlight evidence in the record purportedly indicating that all of their

vehicles are registered with the DOT for both interstate and intrastate commerce.

      With respect to the towing logs, Plaintiffs argue that this evidence is inadmissible

because they are "documents created after discovery concluded."[20]  Pls.' Reply Mem. in Support

Mot. Summ. J. 7.  At oral argument, Defendants' counsel argued that these logs were produced

to Plaintiffs during discovery:

> THE COURT:  Where were those logs?  Were those logs produced
> in discovery?
>
> MR. PIERCE:  I believe they were, judge.  These were requested .
> . . .  They were downloaded on February 19 and produced among
> 17 cartons which we believe were inspected.

OA Tr. 10:10-16.  But shortly thereafter, in response to the Court's question about whether the

documents were produced as part of the initial disclosure pursuant to Fed. R. Civ. P. 26(a),

Defendants' counsel expressed some ambiguity as to the exact circumstances of their production:

> THE COURT:  This is an affirmative defense.
>
> MR. PIERCE:  Yes, your Honor.
>
> THE COURT:  My understanding is that you've got a duty to
> disclose documents related to the affirmative defense.
>
> MR. PIERCE:   They were downloaded on February 19 and
> counsel's inspection of the records came a little while later.  I'm
> not exactly recalling the date.

*Id*. 11:1-7.  Plaintiffs' counsel, for his part, denied that these records were ever produced:

> THE COURT:  This matters.  Were they produced?
>
> MR. ROSEN:  No, sir.

---

[20]     Plaintiffs also renew their argument that Chris Pritsinevelos's declaration is invalid.  As discussed above, the declaration complies with the requirements of 28 U.S.C. § 1746 and is therefore valid.

*Id.* 10-22-24.

In order to clarify this factual dispute, I ordered the parties to submit affidavits from individuals with knowledge of the matter. Order, June 12, 2013. Plaintiffs' counsel submitted an affidavit in which he represented that the towing logs at issue were neither produced during initial disclosure pursuant to Fed. R. Civ. P. 26(a) nor during discovery. Rosen Aff. ¶¶ 5-6, ECF No. 137. Specifically, Plaintiffs' counsel attested that he "methodical[ly] and thorough[ly] examined documents produced by Defendants during discovery on August 29, 2012 and January 30, 2013 and that these towing logs were not among those documents. *Id.* ¶ 14. Defendants' counsel submitted an affidavit in which he represented that among the documents produced by Defendants on January 30, 2013 were "thousands" of Authorization to Tow bills.[21] Margolin Decl. ¶ 7, ECF No. 139. These bills are *not* the towing logs; according to Chris Pritsinevelos, who submitted an affidavit in response to the Court's June 12, 2013 order, these bills are "the original documents showing out of state tows, from which the [logs] were derived."[22] Chris Pritsinevelos Aff. ¶¶ 3-4, ECF No. 140. Indeed, Defendants concede that they do not know whether the logs themselves were ever produced prior to their presentation during the briefing for these cross-motions. Margolin Decl. ¶ 5; Chris Pritsinevelos Aff. ¶ 4.

Based on the representations by counsel, I preclude the towing logs for purposes of this motion. First, the representations make clear that neither the towing logs nor the

---

[21] An Authorization to Tow bill is a form Defendants required its tow truck drivers "to have filled out and signed by the owner of the vehicle to be towed before the towing service can be provided." Margolin Decl. ¶ 3. ECF No. 139. Each bill indicated the "place of pick up and tow destination, the customer's name and address, the date, time, license plate number, the tow truck driver's name, the mileage, the rates, and payment information, and the customer's authorization to tow the vehicle to the destination indicated." *Id.*

[22] Chris Pritsinevelos explained that "[a]s part of Runway's normal business practice, the details of each day's tow operations from the Authorization to Tow bills are entered into [its] computer system and the originals stored." Chris Pritsinevelos Aff. ¶ 3, ECF No. 140. The towing logs represent the data extracted from the computer system. *Id.*

Authorization to Tow bills were produced during initial disclosure, which I find to violate Fed. R. Civ. P. 26(a). Pursuant to Fed. R. Civ. P. 26(a),

> [A] party must, without awaiting a discovery request, provide to the other parties: . . . (ii) a copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

Defendants raised the motor carrier exemption as an affirmative defense in their answer to the first amended complaint. Accordingly, Defendants had a duty to initially disclose any documents or records related to this defense to Plaintiffs. Pursuant to Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information . . . as required by Rule 26(a)," a court may preclude this information "on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Defendants have made no showing of substantial justification or harmlessness.

Second, even if I were to overlook Defendants' violation of Fed. R. Civ. P. 26(a), the representations by counsel make clear that the towing logs were never produced in discovery either. Defendants argue that the Authorization to Tow bills, which form the basis of the towing logs, were produced during discovery. But they did not present this record evidence to the Court in support of its cross-motion; they relied on the towing logs instead.[23] They cannot now, after briefing on these motions is complete, adduce this record evidence to support their argument that they are entitled to the motor carrier exemption. Accordingly, I preclude the towing logs in deciding this motion. Without the towing logs produced by Defendants for purposes of this motion, their only evidence in support of the interstate transportation requirement is Runway's vehicle registrations with the DOT.

---

[23] Defendants' reasoning for relying on the towing logs, rather than the Authorization to Tow bills, is that they did not want to "manually sort through the thousands of the Authorizations to Tow which had been produced for plaintiffs' inspection." Chris Pritsinevelos Aff. ¶ 3.

The parties heavily dispute the significance of Runway's vehicle registrations with the DOT. According to the public website of the Federal Motor Carrier Safety Administration ("FMCSA"),[24] "[c]ompanies that operate commercial vehicles transporting passengers or hauling cargo in interstate commerce must be registered with the FMCSA and must have a USDOT Number." *What is a USDOT Number?*, FMCSA, U.S. DEP'T TRANSPORTATION, http://www.fmcsa.dot.gov/registration-licensing/registration-usdot.htm (last visited June 12, 2013). The USDOT Number "serves as a unique identifier when collecting and monitoring a company's safety information acquired during audits, compliance reviews, crash investigations, and inspections." *Id*. In addition, in certain states, including New York, "all registrants of commercial motor vehicles, *even intrastate* and non-Motor Carrier registrants, are required to obtain a USDOT Number as a necessary condition for commercial vehicle registration." *Id*. (emphasis added).

The record includes two FMSCA Company Snapshots[25] of Runway, one accessed on December 19, 2012, and the other accessed on April 14, 2013. Rosen Decl. Exs. 41-42. The first snapshot indicates that Runway registered with the DOT on March 10, 2006 and described its "carrier operation" as "Intrastate only." Rosen Decl. Ex. 41. The second snapshot indicates that Runway had updated its information on file with the FMCSA on January 14, 2013 and had changed its "carrier operation" from "Intrastate only" to "Interstate." Rosen Decl. Ex. 42. Plaintiffs argue that these snapshots establish that Runway's activities were intrastate only, at

---

[24]        The FMCSA is part of the DOT. Its "primary mission is to prevent commercial motor vehicle-related fatalities and injuries." To that end, it enforces safety regulations, improves safety information systems, and strengthens commercial motor vehicle equipment and operating standards. *About FMSCA*, FMCSA, U.S. DEP'T TRANSPORTATION, www.fmcsa.dot.gov/about/aboutus.htm (last visited June 12, 2013).

[25]        The FMCSA's "Company Snapshot" is "a concise electronic record of a company's identification, size, commodity information, and safety record, including the safety rating (if any), a roadside out-of-service inspection summary, and crash information." *Safety and Fitness Electronic Records (SAFER) System*, FMCSA, U.S. DEP'T TRANSPORTATION, http://safer.fmcsa.dot.gov/companysnapshot.aspx (last visited June 12, 2013). The Company Snapshot is available to the public via the FMCSA's website.

least for the period from March 10, 2006 to January 13, 2013.  Pls.' Reply Mem. in Supp. Mot.

Summ. J. 14, 18; Pls.' Rule 56.1 ¶¶ 219, 221.  In addition, Plaintiffs point out that Runway never

obtained a Motor Carrier Number, Pls.' Reply Mem. in Supp. Mot. Summ. J. 14, 18, which the

DOT requires (in addition to a DOT number), "to operate as a 'for-hire' carrier in interstate

commerce."  *MC Numbers for Motor Carriers*, U.S. DEP'T TRANSPORTATION,

https://ntl.custhelp.com/app/answers/detail/a_id/64/~/mc-numbers-for-motor-carriers (last visited

June 12, 2013).

On the basis of these facts, I conclude that there is no genuine dispute as to

whether the activities of Runway's employees involved interstate transportation.  Defendants'

only evidence in support of the interstate transportation requirement is its own representations to

DOT during the period it employed Plaintiffs.  These representations were that its operations

involved *intrastate* transportation only.  Accordingly, I find the motor carrier exemption to be

inapplicable to Defendants and deny summary judgment to Defendants on Plaintiffs' FLSA

overtime claim on this ground.[26]

2.      *Overtime and Minimum Wage*

Plaintiffs move for summary judgment on their overtime and minimum wage

claims pursuant to the FLSA.

---

[26]     Defendants have failed to meet their burden of establishing the applicability of the motor carrier exemption in a number of other respects (beyond the interstate transportation requirement).  Defendants have not, for example, offered evidence establishing the interstate character of the activities of each Plaintiff.  In other words, they have not shown that interstate travel "was shared indiscriminately by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce." *Morris*, 332 U.S. at 433; *Dauphin*, 544 F. Supp. 2d at 276 ("The record . . . does not disclose how [interstate] runs were assigned and whether they were shared among all . . . drivers.").  Moreover, Defendants do not address the interstate character of the activities performed by the non-driver Plaintiffs, Fallas (dispatcher) and Shao (secretary and office assistant).  Defendants have also not offered evidence establishing whether interstate travel "was part of [each] plaintiff's job duties during the entire period at issue in this litigation," preventing the Court from "determin[ing] whether the motor carrier exemption applies to them for all the relevant workweeks." *Dauphin*, 544 F. Supp. 2d. at 276.

a.     *Employer-Employee Relationship*

The FLSA's overtime and minimum wage provisions apply only to "employees" who are "employed" by "employers."  *See* 29 U.S.C. §§ 206(a), 207(a)(1); *see also id*. § 203(e)(1).  The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  Subject to a number of exceptions inapplicable here, the FLSA defines an "employee" as "any individual employed by an employer."  *Id*. § 203(e)(1).  An entity "employs" an individual if it "suffer[s] or permit[s]" that individual "to work."  *Id*. § 203(g).

The Supreme Court "has instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'"  *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961)).  Accordingly, the Second Circuit "has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances."  *Id*.  Its decisions "have identified different sets of relevant factors based on the factual challenges posed by particular cases."  *Id*. at 142.

In *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), the Second Circuit cited four factors to consider in assessing the "economic reality" of a putative employment relationship: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Id*. at 12 (citation and internal quotation marks omitted).  The Second Circuit later clarified that the presence of these factors in a case, while "*sufficient* to establish employer

status," is not "*necessary* to establish an employment relationship." *Zheng v. Liberty Apparel*

*Co.*, 355 F.3d 61, 71 (2d Cir. 2003) (emphasis in original). The *Carter* test, therefore, is not an

"exclusive four-factor test" for determining whether an entity is an employer under the FLSA,

*id.*, but it is most helpful "for determining when an entity exercises sufficient formal control over

a worker to be that worker's employer under the FLSA," *Barfield*, 537 F.3d at 144.

In a subsequent case, the Second Circuit "employed a more expansive test" to

"distinguish between independent contractors and employees." *Id*. at 142-43. This test

considered the following factors:

> (1) the degree of control exercised by the employer over the
> workers, (2) the workers' opportunity for profit or loss and their
> investment in the business, (3) the degree of skill and independent
> initiative required to perform the work, (4) the permanence or
> duration of the working relationship, and (5) the extent to which
> the work is an integral part of the employer's business

*Brock v. Superior Care, Inc.*, 840 F.2d at 1058-59 (2d Cir. 1988). And more recently, the

Second Circuit set forth a six-factor test for determining whether "an entity has functional

control over workers even in the absence of the formal control measured by the *Carter* factors."

*Zheng*, 355 F.3d at 72. In *Zheng*, which involved garment workers, the court considered:

> (1) whether [the garment manufacturer]'s premises and equipment
> were used for the plaintiffs' work; (2) whether the Contractor
> Corporations had a business that could or did shift as a unit from
> one putative joint employer to another; (3) the extent to which
> plaintiffs performed a discrete line-job that was integral to [the
> garment manufacturer]'s process of production; (4) whether
> responsibility under the contracts could pass from one
> subcontractor to another without material changes; (5) the degree
> to which the [garment manufacturer] or [its] agents supervised
> plaintiffs' work; and (6) whether plaintiffs worked exclusively or
> predominantly for [the garment manufacturer].

*Barfield*, 537 F.3d at 143 (quoting *Zheng*, 355 F.3d at 72).

From these cases, the Second Circuit has established that there exists "no rigid rule for the identification of an FLSA employer." *Id.* Rather, it has provided "a nonexclusive and overlapping set of factors" to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA. *Zheng*, 355 F.3d at 75-76. Moreover, a district court is "free to consider any other factors it deems relevant to its assessment of the economic realities." *Id.* at 71-72.

The parties do not dispute that Runway and Cynthia Pritsevenelos were employers that employed all remaining Plaintiffs[27] with the exception of D'Arpa and Pujols-Vasquez. With respect to D'Arpa and Pujols-Vasquez, Defendants contend that they were independent contractors, rather than employees, of Runway.[28] However, Defendants cite no evidence in support of this contention.[29] Accordingly, I deem the assertion that D'Arpa and Pujols-Vasquez were employees of Runway and Cynthia Pritsevenelos to be undisputed.

Defendants do not explicitly contest the assertion that Chris Pritsinevelos is an employer under the FLSA. However, they do contest Plaintiffs' characterization of Chris Pritsinevelos as a shareholder of Runway during the entire period at issue. Defs.' Resp. Rule 56.1 ¶ 13. To the extent that Defendants rely on this contention to raise a dispute over whether Chris Pritsinevelos was an employer who employed Plaintiffs, I conclude that it is meritless.

---

[27] I use the term "remaining Plaintiffs" to refer to those Plaintiffs whose FLSA claims are timely under the three-year statute of limitations.

[28] In their answer to the first amended complaint, Defendants' Third and Fourth Affirmative Defenses assert that *all* Plaintiffs were independent contractors. Am. Answer ¶¶ 167-68, 171-74. But in their cross-motion papers (which serve also as their opposition papers), Defendants only assert that D'Arpa and Pujols-Vasquez were independent contractors. Defs.' Mem. in Supp. Cross-Mot. Summ. J. 2. Their papers erroneously describe their answer as asserting this defense only on behalf of these two named Plaintiffs. *Id.*

[29] In their cross-motion (and opposition) papers, Defendants simply state that their answer to the first amended complaint asserted the defense that D'Arpa and Pujols-Vasquez were independent contractors. Defs.' Mem. in Supp. Cross-Mot. Summ. J. 2. In their Response to Plaintiffs' Rule 56.1 Statement, Defendants dispute that D'Arpa (but not Pujols-Vasquez) was "employed" by Defendants but also refer back to their answer rather than to any evidence in the record. Defs.' Resp. Rule 56.1 ¶ 2.

Considering the first three of the four *Carter* factors, the record establishes that Chris Pritsinevelos had the power to fire and hire employees, Rosen Decl. Ex. 3, at 9:18-10:13, 51:12-20, 52:18-20 (Chris Pritsinevelos Dep.); supervised and controlled, at least partially, employee work schedules and conditions of employment, *id*. at 13:7-9, 13:13-16, 56:10-12; and determined, at least partially, the rate of compensation, *id*. at 10:2-9, 14:9-18, 51:23-52:17, 55:11-17. These facts are enough to establish as a matter of law that Chris Pritsinevelos exercised sufficient formal control over Runway's employees to constitute an employer under the FLSA. Accordingly, I conclude as a matter of law that Defendants were "employers" who "employed" remaining Plaintiffs as "employees."

      b.    *Enterprise Coverage*

Only those employees who are "engaged in commerce or in the production of goods for commerce," or who are "employed in an enterprise engaged in commerce or in the production of goods for commerce" may seek recovery under the FLSA's overtime and minimum wage provisions. *See* 29 U.S.C. §§ 206(a), 207(a)(1). Thus, an employer is subject to both provisions of the FLSA if either (1) its employees are "engaged in commerce" or (2) the employer is an "enterprise engaged in commerce." *See Jacobs v. New York Foundling Hospital*, 483 F. Supp. 2d 251, 257 (E.D.N.Y. 2007) (delineating the two types of coverage). These two distinct types of coverage are respectively referred to as "individual coverage" and "enterprise coverage." *Jacobs*, 483 F. Supp. 2d at 257; *Bowrin v. Catholic Guardian Society*, 417 F. Supp. 2d 449, 457 (S.D.N.Y. 2006) (citing *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 295 n.8 (1985) ("Employment may be covered under the Act pursuant to either 'individual' or 'enterprise' coverage.")).

Plaintiffs claim that they are entitled to federal minimum and overtime wages under the FLSA's enterprise coverage. Pls.' Mem. in Supp. Mot. Summ. J. 5-7. The term "enterprise," as defined in the statute, is "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r)(1). An enterprise is "engaged in commerce" if it "has employees engaged in commerce . . . or has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person and . . . [its] annual gross volume of sales made or business done is not less than $500,000." *Id.* § 203(s)(1).

The record establishes that Defendants constituted an "enterprise" during the time periods at issue. Cynthia and Chris Pritsinevelos jointly established Runway as a towing company in 2004. Rosen Decl. Ex. 3, at 6:12-15, 7:12-13 (Cynthia Pritsinevelos Dep.). Cynthia Pritsinevelos is the President of Runway and has been responsible for office management and payroll since 2005. *Id.* at 7:11-8:4. Chris Pritsinevelos has been the Operations Director of Runway since approximately 2007; as Operations Director, Chris oversaw "the day-to-day operation" of the company. Rosen Decl. Ex. 4, at 5:3-14 (Chris Prisenevelos Dep.). Both Cynthia and Chris Pritsinevelos exercised the authority to hire and fire employees. *Id.* at 9:18-10:13, 51:12-20, 52:18-20. These facts demonstrate that Cynthia and Chris Pritsinevelos performed "related activities . . . for a common business purpose."

The record further establishes that Defendants constituted an enterprise "engaged in commerce" during the time periods at issue. Even "local business activities fall within the reach of the FLSA when an enterprise employs workers who handle goods or materials that have been moved or been produced in interstate commerce." *Archie v. Grand Central Partnership, Inc.*, 997 F. Supp. 504, 530 (S.D.N.Y. 1998). In other words, the test is met so long as Runway's

employees merely handled equipment or supplies that originated out-of-state. Plaintiffs argue that the tow trucks they drove and the fuel on which the trucks ran originated from out-of-state. Pls.' Mem. in Supp. Mot. Summ. J. 6-7. I find this inference to be inescapable; it is inconceivable that none of the trucks or other materials used by Plaintiffs in their line of work originated outside of New York.

Finally, the parties do not dispute that Defendants generated over $500,000 a year in income during the periods at issue. Pls.' Rule 56.1 ¶ 215. Accordingly, I conclude that remaining Plaintiffs qualify for enterprise coverage under the FLSA as a matter of law.

c. *Overtime*

Pursuant to the FLSA, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). It is of no consequence that an employer compensates his employees daily or weekly, or on any other non-hourly basis. *See* 29 C.F.R. § 778.109 ("The Act does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission, or other basis, but in such cases the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom . . . ."). "To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)).

The FLSA requires employers to maintain accurate records of the hours and wages of their employees. *See* 29 U.S.C. § 211(c) (requiring every employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him"); *see also* 29 C.F.R. § 516.2(a)(7) (requiring that employers maintain records of "[h]ours worked each workday and total hours worked each workweek" by employees). "[A]t summary judgment, if an employer's records are inaccurate or inadequate, an employee need only present 'sufficient evidence to show the amount and extent of [the uncompensated work] as a matter of just and reasonable inference.'" *Kuebel*, 643 U.S. at 362 (quoting *Anderson*, 328 U.S. at 687). "[A]n employee's burden in this regard is not high." *Id*. (citing *Anderson*, 328 U.S. at 687 (remedial purpose of FLSA militates against making employee's burden an "impossible hurdle")). The Second Circuit has established that "it is possible for a plaintiff to meet this burden through estimates based on his own recollection." *Id*.

The record conclusively establishes that Defendants did not pay overtime compensation as required by the FLSA. It is undisputed that each of the remaining Plaintiffs was paid an hourly or daily rate. Pls.' Rule 56.1 ¶¶ 67-85. It is further undisputed that each of the Plaintiffs worked over forty hours in a week on more than one occasion. *Id*. ¶¶ 51-66. Cynthia Pritsinevelos testified that Runway paid overtime only if an employee worked more than twelve hours in a day, not more than forty hours in a week. Rosen Decl. Ex. 3, at 13:11-19, 15:21-16:3 ("A. We do it by day, towing industry does it by day, so it's a 12-hour shift. After the 12 hours, they get paid overtime. We don't do weekly."). She further testified that the overtime rate of compensation was a flat $10 per hour (for every hour over twelve in a single day) and not one and one-half times the regular rate that the employee received. *Id*. at 52:19-53:5. Accordingly, I

grant summary judgment on liability to each of the remaining Plaintiffs on the FLSA overtime claim.[30]

### 3. *Retaliation*

Plaintiffs also move for summary judgment on their retaliation claim pursuant to the FLSA. The FLSA provides that it is "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). "At the summary judgment stage, courts address FLSA retaliation claims under the familiar 'burden-shifting' framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) . . . for the analysis of claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*." *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 471 (S.D.N.Y. 2008). A plaintiff establishes a prima facie case of FLSA retaliation by showing "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)). Once a plaintiff establishes a prima facie case of FLSA retaliation, "the burden shifts to the defendant to articulate a 'legitimate, non-discriminatory reason for the

---

[30] At oral argument, counsel for Plaintiffs conceded that summary judgment on the overtime claim would render moot the minimum wage claim:

> MR. ROSEN: It's not necessary if we have the overtime, then the minimum wage is basically moot because we'll get it in the overtime.

> THE COURT: Because I don't think the case ought to be larded up with the minimum wage claim. Sounds like you agree with that.

> MR. ROSEN: Absolutely.

OA Tr. 7:16-22. Accordingly, I dismiss the FLSA minimum wage claim from the action.

employment action.'" *Id*. (quoting *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000)). "If the defendant meets this burden, the plaintiff must produce 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.'" *Id*. at 53-54 (quoting *Weinstock*, 224 F.3d at 42).

Plaintiffs assert that Defendants retaliated against D'Arpa, Pujols-Vasquez, and Mitchell by "improperly issu[ing] IRS Form 1099s" to these three Plaintiffs on March 29, 2012, "some three weeks after this action was commenced." Pls.' Mem. in Supp. Mot. to Dismiss 31-32. Plaintiffs contend that Defendants had previously failed to issue W-2s to these and other Plaintiffs. *Id*. at 31. The filing of these 1099s, Plaintiffs further assert, forced D'Arpa, Pujols-Vasquez, and Mitchell "to explain and resolve the 1099 issues with the Internal Revenue Services." *Id*. at 32.

I am not convinced that Defendants' issuance of the 1099s constitutes an adverse employment action. "In order to establish an adverse employment action, a plaintiff alleging retaliation must 'show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Torres*, 628 F. Supp. 2d at 472 (quoting *Burlington North & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (analyzing adverse actions in the context of Title VII retaliation claims)); *Mullins*, 626 F.3d at 53. As a general matter, businesses must classify those who work for them as employees or independent contractors, and, based on these classifications, they must issue and file the appropriate tax forms. In other words, by itself, the issuance of a 1099, which is a routine practice for many

businesses, does not square with the typical conception of an adverse employment action, such as discharge or disciplinary action by the employer.

What Plaintiffs take issue with is that Defendants *improperly* issued the 1099s. Specifically, Plaintiffs assert that Defendants issued the 1099s "in an attempt to claim that the Plaintiffs were not employees of Defendants but were instead independent contractors." Pls.' Mem. in Supp. Mot. Summ. J. 32. But this purported impropriety strongly suggests that Defendants issued the 1099s to favorably position themselves in this litigation, rather than as a form of retaliation against D'Arpa, Pujols-Vasquez, and Mitchell for commencing such litigation.[31] Indeed, Plaintiffs fail to establish what rendered the issuance of the 1099s "materially adverse" aside from the vague assertion that D'Arpa, Pujols-Vasquez, and Mitchell were forced "to explain and resolve the 1099 issues with the Internal Revenue Services." *Id.* Accordingly, I deny Plaintiffs' motion for summary judgment on their FLSA retaliation claim.[32]

### 4. *Collective Certification*

Plaintiffs ask the Court to certify their FLSA claims as a collective action under 29 U.S.C. § 216. Pursuant to 29 U.S.C. § 216(b), "[a]n action to recover the liability prescribed [in 29 U.S.C. §§ 206, 207, 215(a)(3)] . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." "In contrast to the 'opt-out' procedure of the Rule 23 class action, proposed class

---

[31] The timing of the issuance of these 1099s strongly suggests that Defendants were attempting to create evidence in support of an argument that these Plaintiffs were independent contractors rather than employees. At the same time, Plaintiffs go too far in suggesting that these 1099s were unusual because Defendants had previously failed to issue any W-2s (or 1099s) to these and other Plaintiffs. Pls.' Mem. in Supp. Mot. to Dismiss 31. The record does not indicate that Defendants *never* issued W-2s, only that they did so on the basis of whether they paid an employee by check or in cash. Rosen Decl. Ex. 3, at 48:3-13 (Cynthia Pritsinevelos Dep.). In fact, Plaintiffs include as exhibits to their own motion copies of W-2s issued by Defendants for two of the Plaintiffs. Rosen Decl. Exs. 52, 56. Moreover, the record indicates that Defendants issued both W-2s and 1099s, albeit on a seemingly erratic and inconsistent basis. Rosen Decl. Ex. 3, at 172:4-22 (Cynthia Pritsenvelos Dep.).

[32] Defendants' cross-motion (and opposition) papers do not address Plaintiffs' FLSA retaliation claim.

members to a FLSA representative action must 'opt in' by filing a written consent with the court." *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 367 (S.D.N.Y. 2007); *see* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such [collective] action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."). "In this way, Section 216(b) creates a device less like a Rule 23 class action and more like permissive joinder, allowing all employees similarly situated to join their cases in one action." *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 196 (S.D.N.Y. 2006).

"Courts generally follow a two-step process when determining whether a matter should proceed as a collective action." *Id.* at 197; *see also Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010) ("[T]he district courts of this Circuit appear to have coalesced around a two-step method, a method which, while [ ] not required by the terms of FLSA or the Supreme Court's cases, we think is sensible."). The first step, also referred to as "the notice stage," typically occurs prior to the conclusion of discovery. *Iglesias-Mendoza*, 239 F.R.D. at 367 (quoting *Torres*, 2006 WL 2819730, at *7). At this juncture, the court "first determines whether class members are similarly situated, based on pleadings and affidavits." *Lee*, 236 F.R.D. at 197 (citing *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 387 (W.D.N.Y. 2005)). Plaintiffs need only make "a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Myers*, 624 F.3d at 555 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)). "Potential class members are then notified and provided with the opportunity to opt in to the action." *Id.* (citing *Scholtisek*, 229 F.R.D. at 387).

At the second step, which occurs after discovery, the court examines the record and "undertakes a more stringent factual determination as to whether members of the class are, in

fact, similarly situated." *Lynch v. United Services Automobile Association*, 491 F. Supp. 2d. 357, 368 (S.D.N.Y. 2007). In other words, the court "on a fuller record, . . . determin[es] whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Myers*, 624 F.3d at 555. If plaintiffs "are indeed similarly situated, the collective action proceeds to trial." *Iglesias-Mendoza*, 239 F.R.D. at 368. "[I]f they are not, the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the class representative[s] may proceed on [their] own claims." *Id*. (citing *ABC Carpet & Home*, 236 F.R.D. at 197); *Myers*, 624 F.3d at 555 ("The action may be 'de-certified' if the record reveals that [plaintiffs] are not [similarly-situated], and the opt-in plaintiffs' claims may be dismissed without prejudice.").

The first step is already completed; the Court approved a stipulation conditionally certifying a collective action on June 26, 2012. Order, June 26, 2012. On July 13, 2012 the Court approved the proposed notice of collective action. Order, ECF No. 16. Fifteen individuals subsequently consented to opt-in to this action. *See* Consents to Joinder, ECF Nos. 24, 35, 36, 39, 40, 41, 42, 43, 47, 48, 49, 52, 53, 61, 63. Plaintiffs now seek a determination that the opt-in plaintiffs are similarly situated with the four named plaintiffs.[33] Pls.' Mem. in Support Mot. Summ. J. 12.

"Neither the FLSA nor its implementing regulations defines the term 'similarly situated.'" *Iglesias-Mendoza*, 239 F.R.D. at 368 (citing *Hoffmann*, 982 F. Supp. at 261). "[D]istrict courts in this circuit typically look to the '(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be

---

[33] Plaintiffs' motion is unusual in that the second inquiry is "generally precipitated by a defendant's motion for decertification, in which the court examines with a greater degree of scrutiny whether the members of the plaintiff class – including those who have opted in – are similarly situated." *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 3d 346, 352 (E.D.N.Y. 2008); *Iglesias-Mendoza*, 239 F.R.D. at 367 ("After discovery – and usually upon a defendant's motion for decertification of the class – a court examines the record and again makes a factual finding regarding the similarly situated requirement.").

individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against [collective action treatment]." *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011) (quoting *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008)). "The burden is on the named plaintiff[s] to prove that the other employees are similarly situated." *Id.*

   The record supports the certification of Plaintiffs' putative collective action as to the FLSA overtime claim.[34] Plaintiffs share similar factual and employment circumstances. The record indicates that Runway was a relatively small operation and that Cynthia and Chris Pritsinevelos almost exclusively managed payroll and employment practices. *See Zivali*, 784 F. Supp. 2d at 463 ("[P]laintiffs must demonstrate that the 'practices' and 'culture' of which they complain are sufficiently uniform and pervasive as to warrant class treatment." (citing *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184 Section "K" (4), 2004 WL 1497709, at *7 (E.D. La. 2004) (finding alleged corporate policy of maintaining low wages insufficient to justify conditional certification when "the 'policy' was not even uniformly or systematically implemented at any given store"); *Bayles v. American Medical Response of Colorado, Inc.*, 950 F. Supp. 1053, 1061-63 (D. Colo. 1996) (denying conditional certification when "each plaintiff's proof of violation will be individualized because it depends upon how or whether defendant's policy was implemented by individual managers with regard to individual plaintiffs, not what the policy was")). Defendants themselves argue that the Pritsinevelos are "a young couple operating a

---

[34]   Plaintiffs appear to seek to certify this action only with respect to their overtime and minimum wage claims and not with respect to the retaliation claim. Indeed, I cannot see how Plaintiffs would prevail on a motion to certify their retaliation claim, given that their papers explicitly argue that D'Arpa, Mitchell, and Pujols-Vasquez were singled out for retaliation by Defendants' issuance of 1099s. Pls.' Mem. in Support Mot. Summ. J. 32 ("Defendants issued 1099s to no other Plaintiffs, except to Plaintiff Christopher D'Arpa, Plaintiff Desmond Mitchell and Plaintiff Josue Pujols-Vasquez. Defendants did not issue any 1099s to anyone else who subsequently opted-in or, upon information and belief, to any other individuals."). I need not address the collective certification of the FLSA minimum wage claim as I have dismissed that claim on the basis of Plaintiffs' counsel's representation at oral argument. *See* note 30.

relatively small business." Defs.' Mem. in Supp. Cross-Mot. Summ. J. 10. More importantly, Defendants explicitly admitted to implementing an overtime policy based on a twelve-hour work day (rather than a forty-hour work week) that paid a "standard $10 an hour" (rather than one and one-half of each employee's regular rate) in contravention of the FLSA.[35] Rosen Decl. Ex. 3, at 52:24-53:4 (Cynthia Pritsinevelos Dep.). Accordingly, I grant Plaintiffs' motion to certify the FLSA overtime claim.

C.    *The New York Labor Law ("NYLL")*

Plaintiffs move for summary judgment on five claims pursuant to the NYLL: overtime, minimum wage, spread-of-hours, deductions, and failure to provide notice. Plaintiffs also seek class certification of their NYLL overtime and minimum wage claims. Accordingly, I address first Plaintiffs' motion for summary judgment on the overtime and minimum wage claims, then their motion for class certification on these claims, and finally their motion for summary judgment on their remaining claims under the NYLL.

1.    *Overtime and Minimum Wage*

The New York Labor Law "is the state analogue to the federal FLSA." *Santillan v. Henao*, 822 F. Supp. 2d 284, 292 (E.D.N.Y. 2011). Although the NYLL "does not require a plaintiff to show either a nexus with interstate commerce or that the employer has any minimum amount of annual sales," it otherwise echoes the FLSA in compensation provisions regarding overtime and minimum wage requirements. *Chun Jie Yin v. Kim*, No. 07-cv-1236, 2008 WL 906736, at *4; ); *Jemine v. Dennis*, 901 F. Supp. 2d 365, 375 (E.D.N.Y. 2012) ("The New York

---

[35]    Because I grant summary judgment to Plaintiffs on their FLSA overtime claim, I need not address potential defenses Defendants might raise against this claim or whether procedural considerations warrant certification. Nevertheless, I note that Defendants' defense to this claim for purposes of this motion – *i.e.* the motor carrier exemption – is applicable to the entire class.

Labor Law mirrors the FLSA in most aspects, including its wage and overtime compensation provisions."); *see* 12 N.Y.C.R.R. §§ 142-2.1-2.2. The NYLL, like the FLSA, requires that employers pay one and one-half times an employee's regular rate of work performed in excess of forty hours a week. For the reasons discussed above with respect to Plaintiffs' FLSA overtime claim, I grant summary judgment to all Plaintiffs[36] on the NYLL overtime claim.[37]

2. *Class Certification*

Plaintiffs also move for class certification of their NYLL overtime claim, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).[38] Plaintiffs seek to certify a class defined as:

> All persons employed by defendants as tow truck drivers, dispatchers and office assistants who were not paid proper . . . overtime premium compensation for all hours that they worked in excess of forty in a workweek any time between March 7, 2006 and the date of final judgment in this matter (the "class period").

Pls.' Mem. in Supp. Mot. Summ. J. 12.

Fed. R. Civ. P. 23(a) sets forth the following four prerequisites for a class action:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(4) the representative parties will fairly and adequately protect the interests of the class.

---

[36] The NYLL's six-year statute of limitations covers at least some portion, if not all, of those Plaintiffs' overtime and minimum wage claims that were time-barred under the FLSA. N.Y. Labor Law § 198(3).

[37] As discussed in note 30, at oral argument, counsel for Plaintiffs conceded that summary judgment on the overtime claim would render moot the minimum wage claim. Accordingly, I dismiss the NYLL minimum wage claim from the action.

[38] Plaintiffs move for class certification of their NYLL overtime and minimum wage claims, but I need not address the certification of the minimum wage claim as I have dismissed it on the basis of Plaintiffs' counsel's representation at oral argument. *See* note 37.

*See also Amchem Products v. Windsor*, 521 U.S. 591, 613 (1997). If Plaintiffs satisfy the Fed. R. Civ. P. 23(a) criteria, they may maintain an action as a class only if it also qualifies under at least one of the categories provided in Fed. R. Civ. P. 23(b). *See Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). Plaintiffs seek to certify a class under Fed. R. Civ. P. 23(b)(3), which permits certification "if the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class litigation is superior to other available members for fairly and efficiently adjudicating the controversy."

A district court must undertake a "rigorous analysis" in order to determine whether the putative class meets each of these Rule 23 requirements. *Heerwagen v. Clear Channel Communications*, 435 F.3d 219, 225 (2d Cir. 2006). This analysis may require the resolution of "factual disputes relevant to each Rule 23 requirement" and a court may make findings with respect to "whatever underlying facts are relevant to a particular Rule 23 requirement." *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24, 41 (2d Cir. 2006). In making such findings, "some showing" by a plaintiff that the requirements are met is insufficient. *Id.* at 42. Rather, a "district judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any threshold prerequisite for continuing a lawsuit." *Id.* This assessment includes weighing "conflicting evidence" where it arises. *Id.*

a.    *Numerosity*

The first requirement of Fed. R. Civ. P. 23(a) is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticability does not mean impossibility of joinder, but rather difficulty or inconvenience of joinder." *Gortat v.*

*Capala Brothers, Inc.*, 257 F.R.D. 353, 362 (E.D.N.Y. 2009) (quoting *Noble v. 93 University Place Corp.*, 224 F.R.D. 330, 338 (S.D.N.Y. 2004)). Courts in the Second Circuit presume numerosity when the putative class consists of at least forty members. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Plaintiffs need not present the court with "a precise calculation of the number of class members; rather, they must show some evidence of the class members that, in effect, provides the Court with a reasonable estimate." *Gortat*, 257 F.R.D. at 362 (citing *Noble*, 224 F.R.D. at 338). The court may also "draw reasonable inferences from that evidence and rely on those inferences when making its determination." *Id.* (citing *Noble*, 224 F.R.D. at 338; *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 204 (E.D.N.Y. 2005) ("[C]ourts are empowered to make common sense assumptions to support a finding of numerosity.") (citation omitted)).

Defendants produced during discovery a list of employees for the time period relevant to these claims – *i.e.* the six years prior to March 7, 2012, when this action was initiated. *See* Rosen Decl. ¶ 22; Rosen Decl. Ex. 25. That list contains the names of 101 individuals. Rosen Decl. Ex. 25. Defendants argue that the numerosity requirement is not met because the case involves only nineteen individuals – *i.e.*, the named and opt-in plaintiffs. Defs.' Mem. in Supp. Cross-Mot. Summ. J. 17. But the numerosity requirement considers the number of individuals in the proposed class – defined here as all persons employed by Defendants as tow truck drivers, dispatchers, and office assistants during the class period – not the number of current named and opt-in plaintiffs in the action. *See Guan Ming Lin v. Benihana New York Corp.*, No. 10-cv-1335, 2012 WL 7620734, at *4 (S.D.N.Y. Oct. 23, 2012) ("[T]he courts in the Second Circuit . . . assess the numerosity requirement based on the size of the proposed class rather than the number of opt-in plaintiffs.") (citing *Niemic v. Ann Bendick Realty*, No. 04-cv-

847, 2007 WL 5157027, at *6 (E.D.N.Y. Apr. 23, 2008). Accordingly, I find that Plaintiffs satisfy the numerosity requirement.

b.    *Commonality*

The second requirement of Fed. R. Civ. P. 23(a) is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality "does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment." *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 153 (S.D.N.Y. 2002) (citation and internal quotation marks omitted); *Espinoza*, 280 F.R.D. at 124 ("Commonality may be met even though class members' individual circumstances differ, so long as their 'injuries derive from a unitary course of conduct.'") (quoting *Noble*, 224 F.R.D. at 338). "[C]ourts have liberally construed the commonality requirement to mandate a minimum of one issue common to all class members." *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198-99 (S.D.N.Y. 1992).

The named plaintiffs' claims and those of the members of the putative class arise from a common wrong: Defendants' failure to pay overtime compensation pursuant to the NYLL. Defendants' practice of compensating employees for overtime based on a twelve-hour workday (rather than a forty-hour workweek) and at a rate of $10 per hour (rather than one and one-half an employee's regular rate of pay) had a common impact on class members. Indeed, courts have consistently held that claims by workers that their employers have unlawfully denied them overtime wages to which they were legally entitled meet the commonality prerequisite for class certification. *See, e.g. Espinoza*, 280 F.R.D. at 127; *Jankowski v. Castaldi*, No. 01-cv-164, 2006 WL 118973, at *2-3 (E.D.N.Y. Jan. 13, 2006); *Noble*, 224 F.R.D. at 343. Accordingly, I find that Plaintiffs satisfy the commonality requirement.

40

c.     *Typicality*

The third requirement of Fed. R. Civ. P. 23(a) is that the claims of the named plaintiffs purporting to represent the class be "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). This inquiry is related to the commonality inquiry, but whereas "the commonality inquiry establishes the existence of a certifiable class, the typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions." *In re Frontier Insurance Group, Inc. Securities Litigation*, 172 F.R.D. 31, 41 (E.D.N.Y. 1997). The claims are typical "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). Typicality does not, however, "require that the factual background of each named plaintiff's claim be identical to that of all class members; rather it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Caridad v. Metro-North Commuter Railroad*, 191 F.3d 283, 293 (2d Cir. 1999).

The named plaintiffs' overtime claims are similar to those of the class members and arise from the same unlawful policy. As discussed above, Defendants had a uniform policy of compensating employees for overtime based on a twelve-hour workday (rather than a forty-hour workweek) and at a rate of $10 per hour (rather than one and one-half an employee's regular rate of pay) in contravention of the NYLL. Accordingly, I find that Plaintiffs satisfy the typicality requirement.

d. *Adequacy*

The fourth and final requirement of Fed. R. Civ. P. 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine whether a named plaintiff will be an adequate class representative, courts inquire whether "1) plaintiff's interests are antagonistic to the interests of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Courts have also considered other factors, "such as whether the putative representatives are familiar with the action, whether they have abdicated control of the litigation to class counsel, and whether they are of sufficient moral character to represent a class." *Espinoza*, 280 F.R.D. at 125 (citing *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998)).

"The fact that [P]laintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class." *Damassia v. Duane Reade*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008). Defendants argue that class certification should be denied because D'Arpa is an inadequate class representative. Specifically, they assert that "there is a problem with the credibility of lead plaintiff Christopher D'Arpa which would disqualify him as a proper representative." Defs.' Mem. in Supp. Cross-Mot. Summ. J. 17. Even if I were to determine that the credibility of D'Arpa was in question, Defendants fail to elucidate how this question renders D'Arpa's interests antagonistic to the interests of the other members of the class. Moreover, Defendants raise no adequacy issue with respect to the three other named Plaintiffs. In addition, Plaintiffs' counsel is qualified to conduct the litigation, a fact Defendants do not dispute. Rosen Decl. ¶¶ 353-57. Accordingly, I find that Plaintiffs satisfy the adequacy requirement.

e.     *Rule 23(b)(3)*

Having satisfied the four prerequisites of Fed. R. Civ. P. 23(a), Plaintiffs must also satisfy one of the three subsections of Fed. R. Civ. P. 23(b).  Plaintiffs seek to certify a class under Fed. R. Civ. P. 23(b)(3), which requires that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class litigation is superior to other available memthods for fairly and efficiently adjudicating the controversy."  The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Products*, 521 U.S. at 623.  This requirement is "more demanding" than the commonality inquiry under Fed. R. Civ. P. 23(a) because "it requires not only that there be disputed issues that can be resolved through 'generalized proof,'" but also that 'these particular issues are more substantial than the issues subject only to individualized proof.'"  *Damassia*, 250 F.R.D. at 159 (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)).

Plaintiffs have established that their NYLL overtime claim can be established through generalized proof.  As discussed above, Defendants have admitted to implementing a uniform policy of compensating employees for overtime based on a twelve-hour workday (rather than a forty-hour workweek) and at a rate of $10 per hour (rather than one and one-half an employee's regular rate of pay) in contravention of the NYLL.  Defendants make no argument to the effect that individual issues predominate.  Accordingly, I find that Plaintiffs satisfy the predominance requirement of Fed. R. Civ. P. 23(b)(3).

In addition to predominance, Fed. R. Civ. P. 23(b)(3) requires that the class action be "superior to other available methods for the fair and efficient adjudication of the controversy."  Plaintiffs argue that a class action is superior to litigation by individual plaintiffs because

individual suits would be prohibitively costly relative to the value of the claims, class members who still work for Defendants would be disinclined from pursuing individual claims for fear of reprisal, and "a class action would eliminate the risk that questions of law common to the class will be decided differently in each lawsuit." Pls.' Mem. in Supp. Mot. Summ. J. 16 (citing *Scott v. Aetna Services, Inc.*, 210 F.R.D. 261, 268 (D. Conn. 2002)).  Defendants make no argument in favor of alternative methods to adjudicate Plaintiffs' NYLL overtime claim.  And "[n]one of the factors mentioned in Rule 23(b)(3) that might cast doubt" on the superiority of a class action is present.  *In re Frontier Insurance Group, Inc. Securities Litigation*, 172 F.R.D. at 48 ("The court has not been made aware of any class members with an interest in 'individually controlling the prosecution . . . of separate actions,' Rule 23(b)(3)(A), or any other pending 'litigation concerning [this] controversy,' Rule 23(b)(3)(B).").  Accordingly, I find that Plaintiffs satisfy the superiority requirement of Fed. R. Civ. P. 23(b)(3) and grant Plaintiffs' motion for class certification of their NYLL overtime claim.

2. *Spread-of-Hours*

The named plaintiffs move for summary judgment on their individual NYLL spread-of-hours claims.  Under the "spread of hours" provision, "[a]n employee shall receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required . . . for any day in which: . . . the spread of hours exceeds 10 hours."  12 N.Y.C.R.R. § 142-2.4.  New York defines "spread of hours" as "the length of the interval between the beginning and end of an employee's workday," which "includes working time plus time off for meals plus intervals off duty."  *Id*. § 142-2.18.  "The employees' entitlement to this compensation is in addition to any claim for minimum-wage payments or overtime."  *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 260 (S.D.N.Y. 2008).

The "district courts are split as to whether spread of hours pay is required for employees making more than the minimum wage." *Ellis v. Common Wealth Worldwide Chauffeured Transportation of NY, LLC*, No. 10-cv-1741, 2012 WL 1004848, at *6 (E.D.N.Y. Mar. 23, 2012). But "the majority of courts of this circuit that have considered this issue" have found that "by its plain language, the spread of hours statute applies only to employees making minimum wage." *Id.* at *8; *see, e.g.*, *Zubair v. EnTech Engineering P.C.*, 808 F. Supp. 2d 592, 601 (S.D.N.Y. 2011) ("[T]he Court finds that the explicit reference to 'minimum wage' in § 142.2-4 indicates that such a provision is properly limited to those employees who receive only the minimum compensation required by law."); *Sosnowy v. A. Perri Farms, Inc.*, 764 F. Supp. 2d 457, 474 (E.D.N.Y. 2011) ("Based on the Court's own reading of the statute, the Court agrees with the cases that find that the explicit reference to the 'minimum wage' in section 142-2.4 indicates that the spread-of-hours provision is properly limited to enhancing the compensation only of those receiving the minimum required by law."); *Espinosa v. Delgado Travel Agency*, No. 05-cv-6917, 2007 WL 656271, at *2 (S.D.N.Y. Mar. 2, 2007) ("By its plain language, section 142–2.4(a) only provides supplemental wages to workers who are paid the minimum wage required under New York law."). "Moreover, the New York State Department of Labor ('DOL') has issued Opinion Letters interpreting New York's spread of hours provision as applying only to employees earning minimum wage." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 369 (S.D.N.Y. 2012) (quoting *Li Ping Fu v. Pop Art International Inc.*, No. 10-cv-8562, 2011 WL 4552436, at *6 (S.D.N.Y. Sept. 19, 2011) (citing N.Y.S. Dep't of Labor 3/16/07 Opinion Letter at 1, File No. RO-07-0009, https://www.labor.ny.gov/legal/counsel/pdf/Minimum%20Wage%20Orders/RO-07-0009A.pdf (last visited June 12, 2012)). I am inclined to agree with this interpretation based on the stronger

weight of authority in its favor as well as the plain statutory language of the spread-of-hours provision.

While it is undisputed that each of the named plaintiffs worked over ten hours in one day on more than one occasion, Pls.' Rule 56.1 ¶¶ 33-36, they have failed to demonstrate that they were paid the minimum wage. Pursuant to the NYLL, the prevailing minimum wage was $6.75 per hour from January 1, 2006; $7.15 per hour from January 1, 2007; and $7.25 per hour from July 24, 2009 to the present. *Id*. § 142-2.1. The named plaintiffs assert that Defendants compensated D'Arpa $100 per day, Pujols-Vasquez $100 or $115 per day, Mitchell $120 per day, and Padilla $115 per day for a twelve-hour workday. *Id*. ¶¶ 71-72, 74, 78. These rates of compensation exceed the minimum wage. At the same time, the named plaintiffs make the vague assertion that "most . . . were paid below the . . . State minimum wage rate during weeks of their employment." Pls.' Mem. in Supp. Mot. Summ. J. 12. And they assert that on at least one occasion, Pujols-Vasquez received compensation falling below the minimum wage. *Id*. ¶¶ 255-57 (stating that Pujols-Vasquez worked 49.72 hours for the week of March 4, 2011 to March 10, 2011 and received $197.50, resulting in a rate of $5.7824 per hour). Accordingly, I conclude that the conflict presented by the named plaintiffs' own factual assertions precludes summary judgment on their individual NYLL spread-of-hours claims.

3. *Deductions*

The named plaintiffs also move for summary judgment on their individual claims that Defendants made deductions from their wages in violation of § 193 of the NYLL. Section 193(1) of the NYLL provides, in pertinent part:

> No employer shall make any deduction from the wages of an
> employee, except deductions which . . . are expressly authorized in

> writing by the employee and are for the benefit of the employee . .
> . . Such deductions shall be limited to payments for:
>
> (i) insurance premiums and prepaid legal plans;
> (ii) pension or health and welfare benefits;
>  . . .
> (xiv) similar payments for the benefit of the employee.

"Once wages are earned, deductions other than those set forth in section 193 are improper."

*Jankousky v. North Fork Bancorporation, Inc.*, No. 08-cv-1858, 2011 WL 1118602, at *3

(S.D.N.Y. Mar. 23, 2011) (citing *Pachter v. Bernard Hodes Group, Inc.*, 10 N.Y. 3d 609, 616-17

(N.Y. 2008)).

Cynthia Pritsinevelos testified that, as a matter of general policy, Defendants

deducted wages for "damage[s]," "short pay," and "[n]ot fueling up" the two trucks. Rosen

Decl. Ex. 3, at 89:6-90:9 (Cynthia Pritsinevelos Dep.). Chris Pritsinevelos similarly testified that

Defendants deducted wages for damages to vehicles. Rosen Decl. Ex. 4, at 125:23-25 (Chris

Pritsinevelos Dep.). These are precisely the types of deductions that the New York State

Legislature contemplated when it enacted Section 193. The provision "was intended to place the

risk of loss for such things as damaged or spoiled merchandise on the employer rather than the

employee." *Hudacs v. Frito-Lay*, 90 N.Y.2d 342, 325 (N.Y. 1997); *see also Maldonado v. La

Nueva Rampa, Inc.*, No. 10-cv-8195, 2012 WL 1669341, at *8 (S.D.N.Y. May 14, 2012) ("The

purpose of § 193 is to prohibit employers from making unauthorized deductions from wages . . .

to place the risk of loss for such things as damaged, spoiled merchandise, or lost profits on the

employer.") (citation, internal quotation marks, and alterations omitted).

Two named plaintiffs specifically assert that Defendants made deductions from

their wages. Mitchell contends that Defendants made unauthorized deductions from his wages

> to cover the costs of damages that the Defendants had claimed that
> I did to their vehicles and . . . for other reasons including
> deductions of $40 during the week of July 1, 2010 as a penalty for
> asking the dispatcher for tractor trailer directions, deductions of
> $100[ ] the week of September 15, 2011 for damages to a
> motorcycle which I did not damage and deductions the week of
> September 29, 2011 for no[t] fueling up the truck.

Rosen Decl. Ex. 8 ¶ 26 (Mitchell Decl.).  Pujols-Vasquez similarly contends that Defendants

made unauthorized "deductions . . . to cover the costs of damages that the Defendants had

claimed that I did to their vehicles and deductions for other reasons including . . . for damages to

a flatbed mirror, deductions for a red light ticket which was issued to me."  Rosen Decl. Ex. 11 ¶

26 (Pujols-Vasquez Decl.).  Defendants do not dispute these assertions.  As to Mitchell, Chris

Pritsinevelos specifically confirmed that Defendants deducted the amount of the purported

damage to the motorcycle from Mitchell's pay.  Rosen Decl. Ex. 4, at 53:5-13 (Chris

Pritsinevelos Dep.).  Accordingly, I grant summary judgment to Mitchell and Pujols-Vasquez on

their NYLL deduction claims.

### 4.    *Failure to Provide Notice*

Finally, the named plaintiffs move for summary judgment on their individual

claims that Defendants failed to comply with notice requirements pursuant to §§ 195(1) and (3)

of the NYLL.  Pursuant to § 195(1), an employer must "provide his or her employees, in writing

. . . at the time of hiring, and . . . each subsequent year of the employee's employment with the

employer, a notice containing [*inter alia*] the rate or rates of pay and basis thereof" and "the

regular hourly rate and overtime rate of pay."  N.Y. Lab. Law § 195(1).  This provision further

requires that "[e]ach time the employer provides such notice to an employee, the employer shall

obtain from the employee a signed and dated written acknowledgement, . . . of receipt of this

notice, which the employer shall preserve and maintain for six years."  *Id.*  Section 195(3)

mandates that an employer "furnish each employee with a statement with every payment of wages, listing [*inter alia*] the dates of work covered by that payment of wages; . . . rate or rates of pay and basis thereof . . .; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked." *Id.* § 195(3).

Plaintiffs' moving papers present only evidence going to Defendants' failure to comply with § 195(3) of the NYLL. Their Memorandum of Law, for example, while reproducing the entirety of § 195 of the NYLL for the Court, limits its discussion of Defendants' purported violation of this provision to § 195(3). Pls.' Mem. in Supp. Mot. Summ. J. 29. Similarly, their Rule 56.1 Statement contains assertions of fact related to Defendants' purported failure to furnish wage statements required by § 195(3), but nothing with respect to their purported failure to provide the annual notice required by § 195(1). *See, e.g.* Pls.' Rule 56.1 ¶¶ 144, 211. Accordingly, I cannot conclude as a matter of law that named plaintiffs are entitled to summary judgment as to § 195(1).

With respect to § 195(3), however, D'Arpa, Mitchell, and Padilla each attested that Defendants compensated them in cash and that they never received wage statements with these payments.[39] Rosen Decl. Ex. 5 ¶ 11 (D'Arpa Decl.); Rosen Decl. Ex. 8 ¶ 10 (Mitchell Decl.); Rosen Decl. Ex. 13 ¶ 10 (Padilla Decl.). Defendants do not dispute these assertions. Indeed, these statements are consistent with Cynthia Pritsinevelos's deposition testimony, in which she admitted that Defendants did not provide wage statements to those employees whom they compensated in cash. Rosen Decl. Ex. 3, at 96:5-98:25 (Cynthia Pritsinevelos Dep.). Accordingly, I grant summary judgment to D'Arpa, Mitchell, and Padilla on the NYLL failure to provide notice claim pursuant to § 195(3).

---

[39]     Pujols-Vasquez did not make such attestations. Rosen Decl. Ex. 11 (Pujols-Vasquez Decl.).

D.    *Damages*

Plaintiffs also move for summary judgment with respect to liquidated damages and attorneys' fees under both the FLSA and the NYLL, and prejudgment interest under the NYLL.

1.    *Liquidated Damages*

Both the FLSA and the NYLL provide for the payment of liquidated damages in appropriate circumstances to employees unlawfully denied payment of overtime compensation. Plaintiffs assert that they are entitled to liquidated damages under both statutes.  Pls.' Mem. in Supp. Mot. Summ. J. 22-25.

Pursuant to 29 U.S.C. § 216(c), an employer who violates the compensation provisions of the FLSA is liable for unpaid wages "and an additional equal amount as liquidated damages."[40]  But pursuant to 29 U.S.C. § 260, liquidated damages may be remitted "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not in violation of the [Act]."  "[T]he employer bears the burden of establishing, by 'plain and substantial' evidence, subjective good faith and objective reasonableness."  *Reich v. Southern New England Telecommunications Corp.*, 121 F. 3d 58, 70-71 (2d Cir. 1997) (citing 29 U.S.C. § 260).  This burden, "is a difficult one to meet, however, and '[d]ouble damages are the norm, single damages the exception.'"  *Id.* at 71 (quoting *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987).

_____

[40]    The Second Circuit has explained that "[a]s used in the FLSA 'liquidated damages' is something of a misnomer."  *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1063 n.3 (2d Cir. 1998).  "It is not a sum certain, determined in advance as a means of liquidating damages that may be incurred in the future.  It is an award of special or exemplary damages added to the normal damages."  *Id.*  Congress provided for liquidated damages in order to compensate employees "for losses they might suffer by reason of not receiving their lawful wage at the time it was due."  *Reich v. Southern New England Telecommunications Corp.*, 121 F. 3d 58, 70 (2d Cir. 1997) (quoting *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991)).

Defendants argue that liquidated damages should be remitted because Defendants acted in good faith "consistent with the practices of the tow truck industry" and reasonably believed that their actions were lawful. "Good faith" in this context requires that a defendant produce "plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it." *Reich*, 121 F.3d at 71 (citing *Brock*, 833 F.3d at 19). The Second Circuit has held that good faith is not demonstrated by "simple conformity with industry-wide practice." *Id*. (citing *Cooper Electric*, 940 F.2d at 910; *Brock*, 833 F.2d at 19-20). Defendants present no additional evidence in support of their argument that they acted in good faith. As to objective reasonableness, as discussed above in connection with the willfulness inquiry in determining the appropriate statute of limitations under the FLSA, Defendants evinced a knowing and deliberate disregard for their legal obligations pursuant to the Act. Hence, they have not met their burden of avoiding the imposition of FLSA liquidated damages.

Separately, the NYLL authorizes an award of liquidated damages, in the amount of 25 percent of unpaid wages, if the employee demonstrates that his employer's violation of the statute was willful. N.Y. Lab. Law §§ 198(1-a), 663(1). "The applicable test for willfulness in this context appears to parallel that employed in determining willfulness for limitations purposes under the FLSA." *Yu G. Ke*, 595 F. Supp. 2d at 261 (citing *Moon*, 248 F. Supp. 2d at 235). Willfulness in the FLSA limitations context involves either knowledge by the employer that his conduct is illegal or reckless disregard for whether it is statutorily prohibited. *McLaughlin*, 486 U.S. at 133. As I have already found, Plaintiffs have demonstrated that Defendants acted willfully in their violation of the FLSA. Accordingly, they are also entitled to an award of liquidated damages under the NYLL.

The only question remaining is whether Plaintiffs may receive two awards of liquidated damages, one under the FLSA and the other under the NYLL. Plaintiffs argue that since the two awards serve different purposes, they may recover both. Pls.' Mem. in Supp. Mot. Summ. J. 24.

"Authority is mixed regarding whether a plaintiff may recover liquidated damages under both federal and state law." *Wicaksono v. XYZ 48 Corp.*, No. 10-cv-3635, 2011 WL 2022644, at *7 (S.D.N.Y. May 2, 2011). However, "[t]he majority of cases allow for 'simultaneous recovery,' because recovery of liquidated damages under federal and state law serves different functions." *Maldonado*, 2012 WL 1669341, at *9 (collecting cases). "Liquidated damages under the FLSA are not a penalty," but rather "compensation to the employee occasioned by the delay in receiving wages caused by the employer's violation of the FLSA." *Yu G. Ke*, 595 F. Supp. 2d at 261 (quoting *Herman*, 172 F.3d at 142); *accord Reich*, 121 F.3d at 71. By contrast, "the liquidated damages provided for in the New York Labor Law are punitive in nature." *Id.* at 262 (citing *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 265 (2d Cir. 1999); *Carter v. Frito-Lay, Inc.*, 425 N.Y.S.2d 115, 115 (1st Dep't 1980)). In any event, Defendants do not contest Plaintiffs' recovery of liquidated damages under both the FLSA and the NYLL. Accordingly, I find that Plaintiffs are entitled to liquidated damages under both statutes.

2. *Pre-Judgment Interest*

Plaintiffs also seek pre-judgment interest on their NYLL overtime claim, recognizing that the receipt of a liquidated damages award under the FLSA limits their recovery of pre-judgment interest pursuant to that statute. Pls.' Mem. in Supp. Mot. Summ. J. 30 (quoting *Brock*, 840 F.2d at 1064 ("It is well settled that in an action for violations of the Fair Labor

Standards Act prejudgment interest may not be awarded in addition to liquidated damages."). Because liquidated damages under the FLSA are compensatory, "they serve as a form of pre-judgment interest, and for that reason a plaintiff who prevails on his FLSA claim and receives liquidated damages may not also receive an award of interest." *Yu G. Ke*, 595 F. Supp. 2d at 261. By contrast, "[p]re-judgment interest and liquidated damages under [New York] Labor Law are not functional equivalents," because the liquidated damages provided for in the NYLL are punitive in nature. *Reilly*, 181 F.3d at 265. Thus, a plaintiff may recover both liquidated damages and pre-judgment interest under the NYLL. *Maldonado*, 2012 WL 1669341, at *10 (citing *Reilly*, 181 F.3d at 265).

Where a plaintiff has already received an award of liquidated damages under the FLSA, that plaintiff "has been compensated for some portion of the delay," *id.*, and "is therefore entitled to an award of prejudgment interest [on the NYLL claim] only on unpaid wages . . . for which liquidated damages pursuant to the FLSA were not assessed." *Santillan*, 822 F. Supp. 2d at 298; *McLean v. Garage Management Corp.*, Nos. 10-cv-3950, 09-cv-9325, 2012 WL 1358739, at *11 (S.D.N.Y. Apr. 19, 2012) (finding plaintiffs were "entitled to NYLL prejudgment interest . . . on unpaid overtime wages for the period during which they will not receive FLSA liquidated damages"); *Gurung v. Malhotra*, 851 F. Supp. 2d 583, 594 (plaintiff not entitled to prejudgment interest on "stand-alone FLSA claims for which liquidated damages were assessed"). Accordingly, Plaintiffs are entitled to prejudgment interest on their unpaid overtime wages for which no federal liquidated damages are awarded – *i.e.* for wages accruing under the longer statutory period under the NYLL.

3. *Attorney's Fees*

Finally, Plaintiffs seek attorneys' fees pursuant to the FLSA and the NYLL. Both the FLSA and the NYLL are fee-shifting statutes entitling prevailing plaintiffs to recover attorneys' fees. *See* 29 U.S.C. § 216(b); N.Y. Lab. Law §§ 198(1-a), (1-d). Accordingly, Plaintiffs are entitled to attorneys' fees.

## CONCLUSION

For the reasons stated above, Defendants' motion for partial summary judgment on the FLSA overtime claim is denied. Plaintiffs' motion for partial summary judgment is granted in part and denied in part. Plaintiffs are granted summary judgment as to the three-year statute of limitations under the FLSA, the FLSA and NYLL overtime claims (to the extent they are timely), the NYLL deduction claim (as to Mitchell and Pujols-Vasquez), and the NYLL failure to provide notice claim pursuant to § 195(3) (as to D'Arpa, Mitchell, and Padilla). Plaintiffs are denied summary judgment on their FLSA retaliation claim and NYLL spread-of-hours claim. Plaintiffs' FLSA and NYLL minimum wage claims are dismissed from this action.

Plaintiffs' motions for collective certification of the FLSA overtime claim and for class certification of the NYLL overtime claim are granted.

The parties are directed to appear before the Court for a status conference on June 27, 2013 at 10:30 AM to discuss damages and possible settlement. The parties are expected to discuss the issue of a possible settlement prior to the conference.

The Clerk of the Court is directed to add Mitchell and Padilla as parties to this action and to dismiss Runway Towing & Recovery Corp. as a defendant in this action.

So ordered.

John Gleeson, U.S.D.J.

Dated: June 18, 2013
       Brooklyn, New York